Docket Nos. 106243, 106273 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee and Cross-Appellant, v. RAYMOND BROWN, Appellant and Cross-Appellee.

*Opinion filed February 4, 2010.*

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman and Burke concurred in the judgment and opinion.

Justice Garman dissented, with opinion, joined by Justices Thomas and Karmeier.

## OPINION

Petitioner Raymond Brown alleged in a *pro se* postconviction petition that his trial counsel was ineffective for failing to request a fitness hearing. The circuit court of Cook County summarily dismissed the petition as frivolous and patently without merit. The circuit court also assessed fees and court costs of $155 under section 22–105 of the Code of Civil Procedure (Code) (735 ILCS 5/22–105 (West 2006)), for filing a frivolous postconviction petition. The appellate court affirmed the dismissal of the petition but vacated the circuit court's imposition of fees and court costs. No. 1–06–3275 (unpublished order under Supreme Court Rule 23).

We allowed petitions for leave to appeal filed by both petitioner and the State (210 Ill. 2d R. 315(a)), and consolidated the appeals. We hold the circuit court erred in summarily dismissing the postconviction petition as frivolous and patently without merit. Accordingly, we reverse the dismissal of the postconviction petition, affirm the judgment vacating the assessment of fees and court costs, and remand this matter to the circuit court for second stage postconviction proceedings.

## I. BACKGROUND

Petitioner was charged with two counts of attempted first degree murder of a peace officer (720 ILCS 5/9–1(a)(1) (West 2002)), and two counts of aggravated assault (720 ILCS 5/12–2(a)(6) (West 2002)). At the bench trial, the testimony showed petitioner lived in an apartment with Gloria Flores. Petitioner became intoxicated and argued with Flores because he believed she had cheated on him. Eventually, Flores threatened to call the police. Petitioner told her to "go ahead and call" because he was not afraid of the police. Flores went upstairs to her sister's apartment. After hearing petitioner continue to yell and throw items in their apartment, Flores and her sister called the police.

When several police officers arrived at the apartment building, petitioner was standing outside the front door of his apartment holding a butcher knife. One of the officers began to approach petitioner. The officer mistakenly believed the object in petitioner's hand was a screwdriver and ordered him to "drop the screwdriver." Petitioner responded by stating, "come on and I'll kill you." After recognizing the object as a knife, the officer repeatedly told petitioner to drop the knife. Petitioner refused and repeated his threat to kill the officer.

Petitioner then advanced toward the officer. The officer backed away and continued ordering petitioner to drop the knife. Petitioner kept walking toward the officer and began swinging the knife as the officer backed away. The officer drew his handgun and pointed it toward petitioner, continuing to order him to drop the knife. Petitioner lunged at the officer, reaching for the handgun with his free hand. When petitioner continued to approach, another officer shot

him. Petitioner did not stop and the officer shot him again. Petitioner was shot in the leg and lower back and fell to the ground. Based on the evidence, the trial court found petitioner guilty of attempted first degree murder of a peace officer.

Petitioner read a statement to the court at sentencing. He asserted that he had been depressed and previously tried to kill himself. He did not intend to harm the police officers, but only wanted them to kill him. He had seen a news report where a man was shot and killed by police officers after threatening them with a machete. Petitioner thought the officers would kill him if he waved a knife at them.

Petitioner further stated he was taking "psych medication" and was told he should have received a psychiatric evaluation prior to his trial, but his trial attorney failed to bring the matter to the court's attention. Petitioner stated he began taking his medications after incarceration and he no longer felt depressed or wanted to kill himself. He still felt like he wanted to die, though, as recently as his previous court hearing.

The trial court questioned counsel about petitioner's statements on taking psychotropic medication. Defense counsel stated he was not aware that petitioner was taking psychotropic medication. The court further inquired whether there was any reason for counsel to have a *bona fide* doubt of petitioner's fitness to stand trial. Counsel responded that petitioner "spoke very coherently to me," he "seemed fine," and counsel "had no problem communicating with him." The trial court noted it had not observed anything in petitioner's conduct or appearance indicating a *bona fide* doubt of his fitness. Petitioner's treatment with psychotropic medication, standing alone, did not raise a presumption of unfitness to stand trial. Accordingly, the trial court proceeded with the sentencing hearing and imposed a 25-year term of imprisonment. The trial court's judgment was affirmed on direct appeal. *People v. Brown*, No. 1–03–2620 (2005) (unpublished order under Supreme Court Rule 23).

Petitioner then filed a postconviction petition alleging, among other things, that his trial counsel was ineffective for failing to request a fitness hearing. Petitioner alleged he told his attorney that he was taking psychotropic medication, including Zoloft, Seroquel, and Sinequan, both before and after his arrest. He alleged he was taking the psychotropic medication to treat bipolar disorder and depression.

-3-

He also informed counsel that he attempted suicide before he was arrested and on the day of his arrest. He alleged he was attempting "suicide by police" on the day of the offense. During his trial, he was taking "very heavy psych medication" that affected his ability to comprehend the events. Petitioner alleged he "didn't know exactly what was happening at [his] trial and didn't understand everything at his trial." Petitioner further alleged his trial counsel lied when he informed the trial court that he was unaware petitioner was taking psychotropic medication.

Petitioner also alleged his attorney only visited him for a few minutes before each hearing. Petitioner believed his attorney was too preoccupied with his father's death to represent petitioner adequately. Petitioner alleged he stopped taking some of his medications to draft his postconviction petition.

Petitioner appended to his petition medical records documenting his bipolar disorder and his medications to treat it. Additionally, he provided affidavits from his mother and aunt attesting that petitioner's mother informed trial counsel petitioner was taking medication to treat his bipolar disorder. Petitioner's mother also averred she told counsel petitioner had attempted suicide on several occasions. Petitioner's mother and aunt averred trial counsel lied to the court when he stated he had no knowledge of petitioner's mental illness or medications.

The trial court summarily dismissed the petition. The court ruled petitioner's claim of ineffective assistance of counsel for failure to request a fitness hearing was barred by *res judicata* because the appellate court considered that claim on direct appeal. The trial court further found the petition was frivolous and patently without merit. Petitioner was assessed $155 in fees and court costs under section 22–105 of the Code for filing a frivolous postconviction petition.

On appeal, petitioner contended he stated the gist of a constitutional claim that his trial counsel was ineffective for failing to request a fitness hearing. Petitioner also challenged the trial court's imposition of fees and court costs.

The appellate court observed it did not consider petitioner's ineffective assistance of counsel claim on direct appeal because that claim was based on matters outside the record. The appellate court,

therefore, held that challenge was not barred by *res judicata*. The appellate court, nevertheless, held the petition did not state the gist of a claim of ineffective assistance of counsel. According to the appellate court, petitioner was "unable to establish the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing had it been apprised of the evidence offered in his postconviction petition." The appellate court further held assessment of fees and court costs under section 22–105 of the Code was not authorized. Accordingly, the appellate court affirmed the trial court's summary dismissal of the postconviction petition but vacated the assessment of fees and court costs. No. 1–06–3275 (unpublished order under Supreme Court Rule 23).

Petitioner and the State filed petitions for leave to appeal (210 Ill. 2d R. 315(a)). We allowed both petitions and consolidated them for review.

## II. ANALYSIS

In his appeal, petitioner contends his postconviction petition established the gist of a claim that his trial counsel was ineffective for failing to raise an issue of petitioner's fitness to stand trial. Petitioner argues the appellate court applied an incorrect standard by requiring him to prove his ineffective assistance of counsel claim at the first stage of the proceedings.

The State responds that the allegations in the petition are not sufficient to raise a *bona fide* doubt of petitioner's fitness to stand trial. The State also claims the record positively rebuts any suggestion that petitioner was unfit. The State, therefore, maintains the petition was properly dismissed as frivolous and patently without merit. The State further asserts petitioner forfeited his argument that the appellate court required him to prove his ineffective assistance of counsel claim because he failed to include that argument in his petition for leave to appeal.

We first address the State's contention that petitioner forfeited his argument that the appellate court applied an incorrect burden of proof in affirming the summary dismissal of the petition. Supreme Court Rule 315(c) requires petitions for leave to appeal to contain a statement of the points relied upon in seeking review of the appellate

-5-

court's judgment. 210 Ill. 2d R. 315(c)(3). The rule also requires a short argument stating why review is warranted and why the appellate court's decision should be reversed or modified. 210 Ill. 2d R. 315(c)(5). An issue may be deemed forfeited if it is not raised in the petition for leave to appeal. *In re Rolandis G.*, 232 Ill. 2d 13, 36 (2008).

Here, the petition for leave to appeal asserted review was warranted for three reasons, including that the appellate court's decision "clearly demonstrates that it applied an incorrect standard in assessing the appropriateness of summary dismissal." Petitioner further asserted "the appellate court erroneously applied a stricter standard when evaluating whether [his] petition was frivolous for purposes of the Post-Conviction Hearing Act." In the argument section, petitioner maintained the appellate court used a much stricter standard than the one applicable to first-stage postconviction proceedings. The petition for leave to appeal, therefore, specifically mentions the issue of whether the appellate court erred by applying an incorrect standard in reviewing the first-stage dismissal. Accordingly, we conclude petitioner has not forfeited his argument.

The summary dismissal of a postconviction petition is reviewed *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998). At the first stage of postconviction proceedings, the trial court examines the petition independently, without input from the parties. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). A petitioner need present only a limited amount of detail and is not required to include legal argument or citation to legal authority. *People v. Edwards*, 197 Ill. 2d 239, 244-45 (2001). A *pro se* petitioner is not excused, however, from providing any factual detail whatsoever on the alleged constitutional deprivation. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). The allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim. *People v. Harris*, 224 Ill. 2d 115, 126 (2007). This standard presents a "low threshold" (*People v. Jones*, 211 Ill. 2d 140, 144 (2004)), requiring only that the petitioner plead sufficient facts to assert an arguably constitutional claim (*People v. Hodges*, 234 Ill. 2d 1, 9 (2009)).

In considering the petition, the trial court may examine the court file of the criminal proceeding, any transcripts of the proceeding, and any action by the appellate court. 725 ILCS 5/122–2.1(c) (West

2006). The trial court must summarily dismiss the petition if it is frivolous or patently without merit. 725 ILCS 5/122–2.1(a)(2) (West 2006). We recently explained that a *pro se* postconviction petition is frivolous or patently without merit only if it "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. A claim completely contradicted by the record is an example of an indisputably meritless legal theory. *Hodges*, 234 Ill. 2d at 16. Fanciful factual allegations include those that are fantastic or delusional. *Hodges*, 234 Ill. 2d at 17.

Petitioner's claim of ineffective assistance of counsel is reviewed under the test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The petitioner must show counsel's performance was deficient and that prejudice resulted from the deficient performance. *People v. Houston*, 226 Ill. 2d 135, 143 (2007), citing *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. A postconviction petition alleging ineffective assistance of counsel may not be dismissed at the first stage of the proceedings if: (1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result. *Hodges*, 234 Ill. 2d at 17.

We first consider whether the allegations in petitioner's postconviction petition set forth an arguable basis in fact for his constitutional claim. Petitioner alleged his constitutional right to effective assistance of counsel was violated because his attorney failed to request a fitness hearing. In support of his claim, petitioner alleged he informed counsel that he was taking psychotropic medication before and after his arrest. The medication was used to treat his bipolar disorder and depression. Counsel was also informed that petitioner previously attempted suicide. Petitioner alleged his offense in this case was an attempted "suicide by police." Petitioner further alleged he was taking "very heavy" psychotropic medication during his trial and did not understand the trial proceedings.

Petitioner attached medical records and affidavits supporting his factual allegations. The medical records documented petitioner's bipolar disorder and his prescribed medications. In their affidavits, petitioner's mother and aunt attested trial counsel was informed

petitioner was taking medication for his bipolar disorder and that petitioner had attempted suicide on several occasions. The medical records and affidavits, therefore, corroborate the allegations in the petition.

We conclude that petitioner's postconviction allegations cannot be characterized as fantastic or delusional. In fact, the trial testimony describing petitioner's offense lends credibility to his allegations on his mental illness and history of suicide attempts. The petition sets forth sufficient facts to assert a claim that is arguably constitutional. Accordingly, we conclude the petition cannot be deemed frivolous or patently without merit for lack of an arguable factual basis.

Next, we must determine whether the petition is based on an indisputably meritless legal theory. As noted, petitioner claims his attorney was ineffective for failing to request a fitness hearing.

Due process bars the prosecution of an unfit defendant. *People v. Hanson*, 212 Ill. 2d 212, 216 (2004). A defendant is unfit to stand trial if, due to a mental or physical condition, he or she is unable to understand the nature and purpose of the proceedings or to assist in the defense. 725 ILCS 5/104–10 (West 2006). The trial court must order a fitness hearing if a *bona fide* doubt is raised of the defendant's fitness. 725 ILCS 5/104–11(a) (West 2006). A number of factors may be considered in assessing whether a *bona fide* doubt of fitness is raised, including a defendant's irrational behavior, demeanor at trial, any prior medical opinion on the defendant's competence, and any representations by defense counsel on the defendant's competence. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). No fixed or immutable sign, however, invariably indicates the need for further inquiry on a defendant's fitness. *Eddmonds*, 143 Ill. 2d at 518. Rather, the question is often a difficult one implicating a wide range of manifestations and subtle nuances. *Eddmonds*, 143 Ill. 2d at 518.

The allegations of the petition and the attached affidavits establish that trial counsel knew petitioner was taking psychotropic medication to treat bipolar disorder and had attempted suicide on several prior occasions. The offense in this case was an attempted "suicide by police." Petitioner further alleged he did not understand the trial proceedings due to the psychotropic medication he was taking during his trial.

The State argues petitioner's allegations do not raise a *bona fide* doubt of his fitness to stand trial. The State asserts petitioner's mental illness, use of psychotropic medication, and history of suicide attempts, each standing alone, do not create a *bona fide* doubt of his fitness. Citing *People v. Mitchell*, 189 Ill. 2d 312 (2000), the State observes the use of psychotropic medication by itself does not raise a *bona fide* doubt of a defendant's fitness.

In *Mitchell*, this court held administration of psychotropic medication is not equivalent to a *bona fide* doubt of a defendant's fitness. *Mitchell*, 189 Ill. 2d at 331. In this case, however, petitioner alleged much more than ingestion of psychotropic medication. He alleged additional facts on his history of suicide attempts, the "suicide by police" nature of his offense, and his inability to understand the trial proceedings. Those facts cannot each be viewed in isolation. This court previously rejected a similar argument, asserting the State's attempt to challenge a defendant's individual suggestions of unfitness "as if each occurred in a vacuum, cannot be countenanced." *People v. Sandham*, 174 Ill. 2d 379, 387-88 (1996). Instead, the impact of the individual events and testimony must be considered as a whole. *Sandham*, 174 Ill. 2d at 388. Accordingly, the State's attempt to view each allegation of unfitness individually must be rejected.

The State also argues the petition is insufficient because it does not allege petitioner informed trial counsel that his medication affected his ability to understand the proceedings. The State contends counsel could not be deficient when he did not know that information. Further, petitioner failed to plead he was prejudiced by the alleged deficient representation because he did not assert that he would have been found unfit if counsel had raised the issue.

In *Hodges*, the State raised a similar argument, contending a *pro se* petitioner did not expressly assert that his factual allegations supported a theory of second degree murder. *Hodges*, 234 Ill. 2d at 21. The State contended the petitioner chose to focus only on self-defense and he should be bound by that choice. *Hodges*, 234 Ill. 2d at 21. We rejected the State's strict reading of the postconviction petition as inconsistent with the liberal construction standards for reviewing *pro se* petitions at the first stage of the proceedings. *Hodges*, 234 Ill. 2d at 21. We held the issue of whether the petition included allegations on second degree murder was the type of

borderline question that should be answered in the petitioner's favor under a liberal construction. *Hodges*, 234 Ill. 2d at 21.

We have consistently held that to survive summary dismissal, a postconviction petition need present only a limited amount of detail and is not required to set forth a constitutional claim in its entirety. *Edwards*, 197 Ill. 2d at 244. Thus, a *pro se* petitioner is not required to allege facts supporting all elements of a constitutional claim to survive summary dismissal. *Edwards*, 197 Ill. 2d at 244-45. The State's contentions that petitioner did not specifically plead certain facts on deficient representation and prejudice are inconsistent with the standards applicable to first-stage postconviction proceedings. Petitioner was not required to plead the specific facts identified by the State as long as his petition sets forth the gist of a constitutional claim.

Finally, the State contends the record contradicts any suggestion that petitioner was unfit to stand trial. The State notes defense counsel informed the trial court at the sentencing hearing that petitioner "seemed fine" and counsel "had no problem communicating with him." The trial court asserted petitioner's conduct and appearance did not indicate a *bona fide* doubt of his fitness. The State contends petitioner's statement at sentencing demonstrates he understood the trial proceedings. The State also observes petitioner answered appropriately when questioned on waiving a jury trial and his right to testify.

A legal theory is indisputably meritless if it is completely contradicted by the record. *Hodges*, 234 Ill. 2d at 16. All well-pleaded facts must be taken as true unless "positively rebutted" by the trial record. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998).

Contrary to the State's argument, petitioner's legal theory is not completely contradicted by the record in this case. Defense counsel's statements at sentencing about petitioner's condition are called into question by petitioner's allegations and supporting affidavits asserting counsel lied to the court when he stated he did not know petitioner was taking psychotropic medication. Defense counsel's statements are also undermined by petitioner's allegations that counsel spent only a few minutes with him before each hearing and was too distracted by his father's death to devote adequate attention to petitioner's defense. Further, counsel's statements at sentencing do

not positively rebut petitioner's allegations on his mental illness, his suicide attempts, or that his psychotropic medication prevented him from understanding the trial proceedings. Thus, petitioner's legal theory is not completely contradicted by defense counsel's statements at sentencing.

The trial court's statement at sentencing that petitioner's conduct and appearance did not show a *bona fide* doubt of his fitness is a relevant consideration, but it is not determinative of petitioner's fitness to stand trial. The observation does not positively rebut any of petitioner's allegations on his mental illness, psychotropic medications, suicide attempts, or failure to understand the trial proceedings. The trial court's observation, therefore, does not render petitioner's legal theory indisputably meritless.

Additionally, petitioner's statement at sentencing is of limited significance because it was made more than one month after the trial. In his sentencing statement, petitioner asserted he felt like he wanted to die as recently as the prior hearing. Thus, any indication that petitioner was lucid in making the statement at sentencing or understood the trial proceedings at that time does not necessarily establish his condition at the time of trial. The statement does not positively rebut any of petitioner's allegations tending to indicate a *bona fide* doubt of his fitness. In particular, the statement does not contradict petitioner's allegation that his psychotropic medication prevented him from understanding the trial proceedings.

Petitioner's waivers of his right to a jury trial and his right to testify were essentially brief exchanges with the trial court where petitioner asserted he understood the trial court's admonitions. Those brief exchanges do not positively rebut any of petitioner's allegations in his postconviction petition. Additionally, they do not conclusively demonstrate an ability to understand the proceedings or assist in the defense.

In sum, we conclude petitioner's legal theory is not completely contradicted by the record. At most, the record creates a factual dispute on whether there was a *bona fide* doubt of petitioner's fitness. Petitioner's claim of ineffective assistance of counsel for failure to request a fitness hearing is arguably supported by the allegations in his petition and supporting affidavits. The petition and supporting affidavits alleged counsel knew petitioner was taking psychotropic

medication to treat bipolar disorder and that he had attempted suicide on several prior occasions. Petitioner further alleged his psychotropic medication caused an inability to understand the trial proceedings. Those allegations and the nature of this offense at least arguably raise a *bona fide* doubt of petitioner's ability to understand the nature and purpose of the proceedings and assist in his defense. We, therefore, conclude counsel's failure to request a fitness hearing arguably fell below an objective standard of reasonableness and prejudiced petitioner.

In finding the petition subject to summary dismissal, the dissent fails to apply the standards applicable to first-stage postconviction proceedings. The dissent initially acknowledges a postconviction petition is subject to summary dismissal at the first stage if it " 'has no arguable basis either in law or in fact' " (slip op. at 16 (Garman, J., dissenting, joined by Thomas and Karmeier, JJ.), quoting *Hodges*, 234 Ill. 2d at 16), but the dissent does not apply that standard to this case. Instead, citing *People v. Easley*, 192 Ill. 2d 307, 319 (2000), the dissent claims a *pro se* petitioner must allege "facts that existed at the time of his trial that, if known to the trial court at that time, *would have caused* the trial court to find a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense." (Emphasis added.) Slip op. at 20 (Garman, J., dissenting, joined by Thomas and Karmeier, JJ.). Significantly, *Easley* is a capital case. Thus, the petitioner in *Easley* was required to carry the second-stage burden of establishing a substantial showing of a constitutional deprivation. *Easley*, 192 Ill. 2d at 316; see also *Hodges*, 234 Ill. 2d at 11 n.3 (second-stage postconviction proceedings involve inquiry into whether petition and accompanying documentation "make a substantial showing of a constitutional violation"). The dissent, therefore, requires petitioner to allege more than an arguable basis in law and fact.

The dissent's application of an incorrect standard to this first-stage dismissal appears to stem from its reliance on numerous capital cases. The dissent acknowledges those cases "can be distinguished in one important respect" because they are all capital cases where the petitioner likely had assistance of counsel in preparing the petition. Slip op. at 42 (Garman, J., dissenting, joined by Thomas and Karmeier, JJ.), citing 725 ILCS 5/122–2.1(a) (West 2006). In addition

-12-

to being distinguishable on the basis acknowledged by the dissent, the capital cases cited are, more importantly, inapposite because they involve application of an entirely different standard for dismissal. Postconviction proceedings in capital cases are not subject to the summary dismissal procedure applicable to non-capital cases. 725 ILCS 5/122–2.1(a) (West 2006). Rather, after appointment of counsel is addressed, capital cases are automatically docketed for further proceedings. 725 ILCS 5/122–2.1(a), (b) (West 2006); *People v. Williams*, 209 Ill. 2d 227, 233 (2004). If the State files a motion to dismiss the petition, the trial court must consider whether the petition's allegations establish a substantial showing of a constitutional violation. *Williams*, 209 Ill. 2d at 233. Thus, capital cases do not involve application of the minimal first-stage standard requiring only an arguable basis in law and fact.

The dissent's analysis is also inconsistent with the standards for reviewing first-stage dismissals in another important way. At the summary dismissal stage, a petitioner's allegations must be taken as true and liberally construed. See *People v. Brooks*, 233 Ill. 2d 146, 153-54 (2009). The dissent, nevertheless, attempts to narrow petitioner's allegations on his fitness by asserting they are directed at other claims in his petition or are conclusory because they "lack specific factual content." Slip op. at 23 (Garman, J., dissenting, joined by Thomas and Karmeier, JJ.). The dissent would require petitioner to support his allegations with specific examples of his inability to comprehend the proceedings. Slip op. at 23 (Garman, J., dissenting, joined by Thomas and Karmeier, JJ.). The dissent, therefore, fails to accept as true and construe liberally the allegations of the *pro se* petition as required at the first stage of postconviction proceedings.

We further note that the dissent compares this case to *People v. Swamynathan*, 385 Ill. App. 3d 434 (2008), and this court recently affirmed the appellate court's judgment in that case. In the appeal to this court, however, no issue was raised on the sufficiency of the petition's allegations to survive summary dismissal. Rather, our decision in *Swamynathan* only considered the legal issue of when the 90-day summary dismissal period begins to run in cases where a pleading is recharacterized as a postconviction petition. See *People v. Swamynathan*, No. 107441, slip op. at 7 (January 22, 2010). This court did not review the appellate court's determination that the

allegations of the petition were frivolous and patently without merit because we were not called upon to consider that portion of the appellate court's decision. See *Swamynathan*, No. 107441 (January 22, 2010).

Overall, the dissent fails to review this case using the standards applicable to summary dismissals. As in *Hodges*, the dissent's analysis is more appropriate to second-stage postconviction proceedings. See *Hodges*, 234 Ill. 2d at 22. Based on the specific facts of this case, we conclude petitioner's postconviction petition has an arguable basis in fact and in law. Accordingly, the trial court erred in summarily dismissing the petition as frivolous and patently without merit at the first stage of the proceedings, and the appellate court erred in affirming the dismissal.

Our decision only entitles petitioner to advance to the second stage of the proceedings where he may be appointed counsel and submit an amended petition. See 725 ILCS 5/122–4, 122–5 (West 2006). We do not express an opinion on whether petitioner will be able to meet the second-stage standard and proceed to an evidentiary hearing on his amended petition. See *Edwards*, 197 Ill. 2d at 246-47 (decision on whether petitioner has established a substantial showing of a constitutional violation is inappropriate at the summary dismissal stage of postconviction proceedings).

Finally, in its appeal, the State argues the appellate court erred in vacating the assessment of fees and court costs after concluding the petition was properly dismissed as frivolous and patently without merit. According to the State, the standard for assessing fees and costs under section 22–105 of the Code is the same as the standard for summary dismissal of a postconviction petition. Accordingly, section 22–105 requires assessment of fees and court costs when, as here, a postconviction petition is properly dismissed as frivolous.

Petitioner responds that this court need not address the State's claim because his petition was improperly dismissed as frivolous and patently without merit. Thus, he was not subject to assessment of fees and court costs in any case. Alternatively, petitioner contends section 22–105 does not require assessment of fees and court costs every time a court dismisses a petition at the first stage of postconviction proceedings.

Section 22–105 provides for assessment of filing fees and actual court costs when a prisoner files a pleading, including a postconviction petition, and the court specifically finds it is frivolous. 735 ILCS 5/22–105(a) (West 2006). We have determined that the postconviction petition here was improperly dismissed as frivolous and patently without merit. Thus, there is no longer any basis for assessing fees and court costs under section 22–105, and the assessment must be vacated.

Having vacated the assessment, we need not consider the State's argument on whether section 22–105 requires assessment of fees and court costs whenever a postconviction petition is summarily dismissed. The construction of section 22–105 is no longer at issue in this case because the fees and costs imposed under that section have been vacated. Generally, reviewing courts will not render advisory opinions or consider an issue when it will not affect the result. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009), citing *In re Mary Ann P.*, 202 Ill. 2d 393, 401 (2002); *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990). Accordingly, we decline to consider the construction of section 22–105 because that issue will not affect the result in this case.

### III. CONCLUSION

For the foregoing reasons, we reverse the part of the appellate court's judgment affirming the circuit court's summary dismissal of petitioner's postconviction petition. We affirm the part of the appellate court's judgment vacating the assessment of fees and court costs under section 22–105 of the Code. The cause is remanded to the circuit court for second-stage postconviction proceedings.

*Affirmed in part and reversed in part;*
*cause remanded.*

JUSTICE GARMAN, dissenting:

The majority concludes that under the rule announced by this court in *People v. Hodges*, 234 Ill. 2d 1 (2009), petitioner is entitled

to proceed to the next stage of postconviction review because his legal theory is "not completely contradicted by the record." Slip op. at 11. In addition, the majority finds that the allegations in his postconviction petition "and the nature of this offense at least arguably raise a *bona fide* doubt of petitioner's ability to understand the nature and purpose of the proceedings and assist in his defense" Slip op. at 12. By the "nature of this offense," the majority refers to petitioner's alleged attempt to commit "suicide by police." Slip op. at 9.

In my opinion, the majority has misapplied the rule of *Hodges*, misread the record, and ignored established precedent. I, therefore, dissent.

The Rule Adopted in *Hodges*

In *Hodges*, this court clarified the standard that a postconviction petition must meet to avoid summary dismissal on the basis that it is "frivolous" or "patently without merit" (725 ILCS 5/122–2.1(a)(2) (West 2006)). These terms are not defined in the Post-Conviction Hearing Act. We held in *Hodges* that these terms refer to a petition that "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 12.

In *Hodges*, we adopted the United State's Supreme Court's language that defines a claim with no arguable basis in law as a claim " 'based on an indisputably meritless legal theory.' " *Hodges*, 234 Ill. 2d at 13, quoting *Neitzke v. Williams*, 490 U.S. 319, 327-28, 104 L. Ed. 2d 338, 348, 109 S. Ct. 1827, 1833 (1989). As an example of an indisputably meritless legal theory, we mentioned "one which is completely contradicted by the record." *Hodges*, 234 Ill. 2d at 16, citing *People v. Robinson*, 217 Ill. 2d 43 (2005).

The majority concludes that the legal theory asserted in petition in this case was not "completely contradicted by the record," quoting these words numerous times as if this were the standard announced in *Hodges*. It was not. In *Hodges*, we cited *Robinson* merely as *one example* of a situation in which a postconviction petition was properly dismissed because the petitioner's legal theory was indisputably meritless. *Hodges*, 234 Ill. 2d at 16-17. Robinson claimed that his trial counsel had been ineffective for failing to raise a particular

-16-

hearsay objection. This court rejected this claim as meritless because the record revealed that the statement would likely have been admissible under the spontaneous declaration exception to the hearsay rule. *Robinson*, 217 Ill. 2d at 62-63. Our opinion in *Robinson* did not use the phrase "completely contradicted by the record."

However, in *Hodges*, we characterized *Robinson* as a case in which the legal theory advanced by the petitioner was indisputably meritless because it was "completely contradicted by the record." We did not, however, state that "complete" contradiction is the *sine qua non* of a meritless legal theory. For example, we analogized a frivolous postconviction petition to an appeal that is frivolous because it is " 'not warranted by existing law' or good-faith argument for 'modification *** of existing law.' " *Hodges*, 234 Ill. 2d at 12, quoting 155 Ill. 2d R. 375(b).

Thus, a claim raising a question of law that is already well settled by decision of this court or the United States Supreme Court is another example of an indisputably meritless legal theory. For example, a postconviction petition claiming that the petitioner was entitled to have the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), applied retroactively to his case is indisputably meritless if his direct appeal was exhausted prior to the issuance of the *Apprendi* decision. See *People v. De La Paz*, 204 Ill. 2d 426 (2003). Under the rule of *Hodges*, summary dismissal of such a petition would be proper.

The partial dissent in *Hodges* took the position that the petitioner's legal theory, that is, his claim of imperfect self-defense, was frivolous and patently without merit because the undisputed facts of record completely contradicted it. Thus, the partial dissent employed "complete contradiction" in the manner intended by this court–as one possible basis for finding the legal theory asserted in a postconviction petition to be indisputably meritless. The majority in the present case elevates this one possible basis to the status of an absolute requirement.

In sum, the majority's focus on the question of complete contradiction obscures our holding in *Hodges*. As a result of this misplaced focus, the majority does not fully address the standard that we actually adopted in *Hodges*–whether the petition is frivolous or

completely without merit because it lacks either an arguable basis in law or in fact.

I agree with the majority that petitioner's claim has an arguable basis in law. Slip op. at 11. It is well established that due process is violated if, once a *bona fide* doubt of fitness has been raised, a hearing is not held to determine whether the defendant is unable to understand the nature and purpose of the proceeding or to assist in his defense. *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991).

However, even if a petitioner asserts a recognized legal theory that is arguably applicable in his case, a petition may also be dismissed at the first stage if the claims therein have no arguable basis in fact. *Hodges*, 234 Ill. 2d at 17. In *Hodges*, we adopted the Supreme Court's definition of such claims as those " 'whose factual contentions are clearly baseless.' " *Hodges*, 234 Ill. 2d at 13, quoting *Neitzke*, 490 U.S. at 327-28, 104 L. Ed. 2d at 348, 109 S. Ct. at 1833. Baseless factual claims *include* those that are " 'fantastic or delusional' " (*Hodges*, 234 Ill. 2d at 13, quoting *Neitzke*, 490 U.S. at 327-28, 104 L. Ed. 2d at 348, 109 S. Ct. at 1833), but not all baseless factual claims are necessarily delusional. A factual claim may be baseless where the record belies the claim made in the petition. *People v. Torres*, 228 Ill. 2d 382, 394 (2008) ("this court has consistently upheld the dismissal of a postconviction petition when the allegations are contradicted by the record from the original trial proceedings"). See also 725 ILCS 5/122–2.1(c) (West 2006) ("In considering a petition pursuant to this Section, the court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceeding").

In addition, our holding in *Hodges* did not lower the previously existing standard for first-stage dismissal or expressly or impliedly overrule the large body of precedent dealing with claims that trial counsel was ineffective for failing to request a fitness hearing.

Based on these precedents and my review of the entire record, I conclude that petitioner's claim of ineffective assistance of counsel is patently without merit. The factual allegations in the petition, taken as true, are clearly baseless because they do not raise a *bona fide* doubt of his fitness to stand trial when viewed in light of the record as a whole.

-18-

Ineffective Assistance of Counsel

The majority correctly rejects the State's contention that dismissal was proper because petitioner did not specifically plead facts in support of the deficient representation and prejudice prongs of the *Strickland* test. Slip op. at 9. As a *pro se* petitioner, he is not required to cite to legal authority and, thus, cannot be expected to categorize his factual assertions as relating to a particular prong of a particular test. *Hodges*, 234 Ill. 2d at 21. However, to survive summary dismissal, he is required set forth the gist of a constitutional claim. This means that he must set forth some factual basis for his claim–some facts that would, if true, support a finding that counsel's performance was deficient as well as some facts that would, if true, support a finding of prejudice.

The majority does not separately consider those allegations in the petition that relate to counsel's performance and those that relate to prejudice.

Review of the petition reveals several allegations relating to counsel's performance in general. For example, petitioner alleges that counsel spent very little time with him, made false assurances about his likelihood of acquittal, failed to contact potential defense witnesses, and failed to properly cross-examine witnesses. Only two allegations regarding counsel's performance are arguably relevant to the question of whether his performance was deficient for failing to request a fitness hearing. First, petitioner alleges that counsel knew that he was taking three psychotropic medications both before and after his arrest and that petitioner had attempted suicide prior to his arrest and on the day of his arrest. Second, petitioner also alleges that counsel lied when he told the court at the sentencing hearing that he was unaware petitioner was taking psychotropic medication. Assuming, *argued*, that these allegations are sufficient, if true, to establish that counsel's performance was deficient, petitioner must still allege sufficient facts to create an arguable question of prejudice. *Hodges*, 234 Ill. 2d at 17. A question is arguable if it is "open to argument, dispute, or question." Webster's Third New International Dictionary 116 (1993).

To meet the prejudice prong of the *Strickland* test in a postconviction claim of ineffective assistance of counsel for failure to obtain a fitness hearing, the petitioner:

-19-

"must demonstrate that facts existed at the time of his trial which raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense. The petitioner is entitled to post-conviction relief on his ineffective-assistance claim only if he shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been informed of the evidence raised in his post-conviction petition." *Eddmonds*, 143 Ill. 2d at 512-13.

Further, the petitioner bears "the burden of proving that, at the time of trial, there were facts in existence which raised *a real, substantial and legitimate doubt* as to his mental capacity to meaningfully participate in his defense and cooperate with counsel. The test is an objective one." (Emphasis added.) *Eddmonds*, 143 Ill. 2d at 518. Factors that are relevant to this inquiry include: the petitioner's irrational behavior and his demeanor at trial, any prior medical opinion on his competence to stand trial; and any representations by defense counsel on the defendant's competence. *Eddmonds*, 143 Ill. 2d at 518.

*Eddmonds*, which is cited by the majority (slip op. at 8) for this formulation of several relevant factors, reached this court in a different procedural posture from the present case. *Eddmonds* was a capital case in which the trial court granted postconviction relief and the State brought the appeal to this court. The quoted language refers to the petitioner's burden of proof at the hearing stage of postconviction proceedings.

Nevertheless, this language from *Eddmonds* reveals what a petitioner must allege in his postconviction petition regarding the prejudice prong of the *Strickland* test to create an arguable question of fact. He must allege facts that existed at the time of his trial that, if known to the trial court at that time, would have caused the trial court to find a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense. *People v. Easley*, 192 Ill. 2d 307, 319 (2000) ("critical inquiry" at first stage of postconviction proceedings is whether the allegations in the petition raise a *bona fide* doubt of petitioner's fitness at the time of trial). If he meets this requirement, dismissal is improper and he is entitled to have his petition docketed for further consideration (725 ILCS

-20-

5/122–2.1(b) (West 2006)) and, if he is indigent, to have counsel appointed to assist him (725 ILCS 5/122–4 (West 2006)).[1]

In addition, in considering whether the petition alleges facts sufficient to state the gist of a constitutional claim, "the court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceeding." 725 ILCS 5/122–2.1(c) (West 2006). The allegations made in the postconviction petition must also be considered in light of the facts known to the trial court at the time. See, *e.g.*, *People v. Moore*, 189 Ill. 2d 521 (2000) (affirming dismissal of postconviction petition where the claim raised in the petition was belied by the trial record). The critical question, then, is whether allegations in postconviction petition, taken as true, but viewed in light of the record, sufficiently allege prejudice to preclude summary dismissal.

---

[1]The majority objects to the citation to *Easley*, a capital case, as a source of the applicable rule for the circuit court's consideration of a postconviction claim of unfitness to stand trial. Slip op. at 12. The majority, however, cites *Eddmonds*, another capital case, for the rules applicable to the same issue. Slip op. at 8.

The majority goes on to assert that this dissent would require a postconviction petitioner to "allege more than an arguable basis in law and fact." What the majority overlooks is the existence of an arguable basis in fact is not determined in a vacuum. The factual basis must be examined in light of the legal claim being asserted. In this case, petitioner argues that he was entitled to a fitness determination. His argument has merit only if it is open to dispute that the facts he now alleges would have entitled him to a fitness hearing had they been known to the trial court at the time of his trial. See, *e.g.*, *People v. Alberts*, 383 Ill. App. 3d 374, 378 (2008) (in a noncapital case, when postconviction claiming that petitioner was unfit to stand trial is summarily dismissed, "critical inquiry" on appeal is whether the facts presented in defendant's postconviction petition would have raised a *bona fide* doubt of his fitness to stand trial had the trial court been aware of their existence).

The Postconviction Petition and the Record

The postconviction petition, which contains 22 numbered claims in 26 handwritten pages, was accompanied by 18 affidavits and copies of portions of petitioner's medical records. The bulk of the petition involves allegations that various witnesses lied at his trial, that he lacked the intent to commit murder, or that the State pursued his prosecution to prevent him from filing a lawsuit against the officer who shot him. Only three paragraphs arguably relate to the question of his fitness to stand trial.

First, petitioner states that he was not given a psychiatric evaluation and that an evaluation would have shown his "state of mind at the time of [his] arrest and at the time of trial."

Second, he states several times that he "wanted to die on the day of his arrest and wanted the police to kill him and when he was not kill[ed] by the police he still wanted to die." He describes "fighting off" the paramedics and refusing treatment. He also states that he had "tried to kill himself before" and "was on psych medication" before his arrest.

Third, petitioner alleges in the final paragraph of his petition:

> "Now Brown was on very heavy Psych Medication at the time of Brown trial and Brown didn't know exactly what was happening at Brown trial and didn't understand everything at his trial. Now Brown had to stop taking some of his Psych Medication his Trazodone Medication to write and explain these event in this Document clearly so Brown can understand what Brown was writing to the best of his ability and Brown know and believe's in his heart and has proven that he didn't want to hurt or kill anyone but himself by Suicide by Police and know that Brown is not Guilty of first degree Murder. And Brown has proven that the evidence in this Document would have changed the outcome of the trial. Now if you need to find out more you can ask Brown Mother Virginia Guerrero and Gloria Flores and Patricia Romas they know that these things Brown Say's are true. Now every thing Brown has say in this Document is what Brown feel's and knows is the truth."

Six of the affidavits were made by the petitioner, only one of which relates to his fitness to stand trial. Petitioner avers that "before my arrest I was taking Zoloft 50, Seroquil 400, Sinequan 100 and because of the very heavy psych medication I was taking made me unable to understand everything and unable to think and answer everything the way I should have and made me feel like I could not talk or question anything at my trial. It just made me slow to react in my mind."

His mother's affidavit states that prior to his arrest, petitioner was diagnosed as bi-polar and was taking medication. She also states that he had made several suicide attempts prior to his arrest. Petitioner's aunt's affidavit repeats these claims. (Other allegations in these affidavits relate to counsel's performance, not to any possible prejudice to petitioner.) Medical records document the diagnosis and treatment with medication.

The overarching theme of the petition and accompanying affidavits is that petitioner should not have been found guilty of attempted murder because he did not intend to kill the officer. Rather, he intended to provoke the police into killing him. He argues that the way he was holding the knife shows lack of intent to kill, witnesses against him lied, and the entire prosecution was a plot to keep him from filing a lawsuit. The first two statements quoted above regarding his "state of mind" and his wanting to die are part of this argument regarding his lack of intent to commit murder and are not directed at or relevant to his fitness for trial.

The only allegations that touch on his fitness to stand trial are the statement in the petition that he did not know what was happening at trial and the statement in his affidavit that he was "unable to understand everything and unable to think and answer everything the way I should have and made me feel like I could not talk or question anything at my trial. It just made me slow to react in my mind." These few words constitute the entirety of his claim that a *bona fide doubt* of his fitness to stand trial existed at the relevant time.

This statement is conclusory and belied by the trial record. The majority, however, devotes only one paragraph to its discussion of the factual allegations in the petition. Slip op. at 11-12. Without any reference to the record, the majority finds that petitioner's claim is

"arguably supported by the allegations in his petition and supporting affidavits." Slip op. at 11.

*Conclusory Allegations*

"Nonfactual and nonspecific assertions which merely amount to conclusions are insufficient to require a hearing under the Post-Conviction Hearing Act." *People v. Burt*, 205 Ill. 28, 35-36 (2001); *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). See also *Torres*, 228 Ill. 2d at 394 (reviewing summary dismissal of postconviction petition and noting that at this stage, nonfactual and nonspecific assertions are insufficient to require further proceedings).

A *pro se* petitioner is required to provide only a limited amount of detail in his postconviction petition. *Torres*, 228 Ill. 2d at 394. However, petitioner's conclusory allegations that he "didn't know exactly what was happening" at his trial, that he was "unable to think," and that he "could not talk or question anything" are descriptive, but lack specific factual content. He does not provide a single example of something that he failed to understand or that he would have questioned. He "offers no evidence regarding his demeanor or that he acted irrationally at trial" (*People v. Johnson*, 183 Ill. 2d 176, 194 (1998)), thus negating one of the three factors identified in *Eddmonds*. There are absolutely no specific factual allegations supporting his claim that he was actually confused during his bench trial. Thus, he has failed to identify a question of fact regarding his fitness to stand trial that is open to argument, dispute, or question.

It is noteworthy that when petitioner briefly raised the question of a fitness hearing at his sentencing hearing, it was because "some people" had told him that because he was taking medication, he might not have had to go to trial. He did not suggest at that time that the medication affected him at trial, only that he would "find out" if he could have avoided trial. Not until he prepared his postconviction petition did he begin to assert that the medications affected him adversely. Indeed, in his statement at sentencing, he credited his improved his mood and outlook to the medications that he now says made him "unable to think," and he stated that he needed to continue taking them to remain on an even keel.

-24-

After our decision in *Hodges*, the appellate court affirmed the summary dismissal of a postconviction petition in *People v. Miller*, 393 Ill. App. 3d 629, 640 (2009), on the basis that the allegations of ineffective assistance of counsel were "conclusory and as such fail[ed] to give rise to a gist of a constitutional claim." The petitioner's allegations were insufficient to meet the prejudice prong of *Strickland* even at this first stage of review because they were subjective and self-serving. *Miller*, 393 Ill. App. 3d at 634. The appellate court also noted that *Hodges*, while redefining the term "frivolous and patently without merit," "did not overrule any of the cases" cited in support of the opinion. *Miller*, 393 Ill. App. 3d at 630 n.1. See also *People v. Swamynathan*, 385 Ill. App. 3d 434, 441 (2008) (affirming summary dismissal of postconviction petition where he offered "nothing but conclusory and unsupported assertions that he was not 'mentally competent to enter a plea'; he had not been 'of sound mind'; and he had been suffering from 'a complete mental breakdown' ").

In the present case, as in *Miller* and *Swamynathan*, the postconviction petitioner has made only conclusory assertions that he was prejudiced by counsel's allegedly deficient performance. An arguable question of prejudice is not raised by the bare assertion that he did not understand the proceedings and absent any specific claim that he would have done anything differently at trial.

The majority states that a requirement of nonconclusory factual content is inconsistent with the requirement that the allegations in a postconviction petition be liberally construed. Slip op. at 13. It is not. Liberal construction does not require that the court frame allegations that might have been made to strengthen the claim asserted. Rather, it requires that we accept the factual allegations as true, so long as they " 'can be corroborated and are objective in nature' " *Hodges*, 234 Ill. 2d at 10, quoting *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008). Petitioner's allegations that he wanted to die and that he was taking psychotropic medications, taken as true, are not sufficient to raise an arguable question regarding his fitness to stand trial. Similarly, his conclusory allegations that he was "unable to understand everything" and that he "was slow to react in [his] mind," no matter how liberally construed, are entirely subjective and lack any specific content. Thus,

-25-

petitioner has not raised an arguable question of fact regarding the prejudice prong of the *Strickland* test.

*The Trial Record*

In addition to being conclusory, the petitioner's claim of unfitness to stand trial is belied by the record. See, *e.g.*, *Torres*, 228 Ill. 2d at 396 (noting that postconviction petitioner abandoned his claim that he had not understood the consequence of his guilty plea because the claim was "belied by the record of the guilty-plea proceeding and is therefore frivolous and patently without merit").

Before the bench trial began, defense counsel presented a signed jury waiver. The trial court asked petitioner if he had signed the document. He answered, "Yes, sir." The trial court asked if he understood that he was giving up his right to a jury trial. He responded, "Yes." The trial court explained that if he had a jury trial, the jurors would be selected by defense counsel and the prosecutor and that the function of the jury would be to decide whether he was proven guilty beyond a reasonable doubt. The court further explained that he could not be found guilty unless all 12 jury members concluded, after considering the evidence, that he was proven guilty beyond a reasonable doubt. The court also noted that in a bench trial, the same reasonable doubt standard would apply. The court then asked petitioner if he understood the distinction between a bench trial and a jury trial. He responded, "Yes, sir." Finally, the court asked petitioner if it was still his "decision and desire" to give up his right to a jury trial. He answered, "Yes."

Petitioner's intent to commit "suicide by police" was brought out on cross-examination of one of the State's witnesses, Elei Romero, who testified that when the police told petitioner to drop the object he was holding, which they then believed was a screwdriver, he "said only, 'Come. Shoot me. Come. Shoot me.' " Defense counsel asked this witness how far away petitioner was from the officer when he said "Shoot me." The witness stated that defendant was within about 15 feet of the officer.

In his argument on the motion for a verdict of not guilty at the close of the State's case, counsel noted that his client was "standing in front of several armed officers with their guns drawn," holding a

-26-

knife, saying "shoot me." He argued that not only was petitioner not "in a position to kill any of the officers," suggesting he lacked the intent to kill, but that his actions "guaranteed that he was going to get shot and he knew it."

After denial of the defense motion for a verdict of not guilty, defense counsel informed the court that petitioner did not intend to testify. The trial court explained the significance of the denial of the defense motion. The trial court informed petitioner, "You have the right to testify. You have the right to call witnesses. Do you have witnesses? Are there witnesses that are available that you wanted called in this case?" Petitioner responded:

> "Your honor, I don't have any witnesses. My witness was Gloria Flores, but the State somehow obtained her on their side now. I have letters and stuff that she wrote me. At the beginning she was on my side."

The following exchange then occurred:

> "COURT: You understand you have a right to testify, too, and you have a right to take the witness stand, to be sworn to tell your side off the story under oath–
>
> BROWN: Yes, sir.
>
> COURT: To be examined by your lawyer as well as by the State's Attorneys and to tell whatever you can recall about what occurred that evening. Do you understand that?
>
> BROWN: Yes, sir.
>
> COURT: And from what your lawyer has indicated, you've told him you don't wish to testify?
>
> BROWN: Yes, sir.
>
> COURT: Has anybody promised you anything to cause you to make that decision?
>
> BROWN: No, sir. No, sir.
>
> COURT: Has anybody threatened you to make you not want to testify?
>
> BROWN: No, sir."

In his final closing argument, defense counsel argued that if petitioner "wanted anybody killed, it was himself" and that his intent

to provoke the officers to shoot him created a reasonable doubt of his intent to kill.

The trial court found petitioner guilty, concluding that his advancing towards the officer while brandishing a knife, along with his announced intention to kill a police officer, provided a sufficient basis to find him guilty beyond a reasonable doubt. Based on the evidence and the arguments of defense counsel, the trial court was aware that the defense theory of the case was that petitioner was acting out of his own wish to die and that he lacked intent to kill the police officer. Thus, the court was aware that the petitioner was potentially suicidal. Clearly, the court found that a desire to commit "suicide by police" and intent to kill a police officer are not mutually exclusive states of mind. The court then ordered a presentence report.

Petitioner cooperated with the presentence investigation. He gave a detailed social history. In addition to the three children he has with Gloria Flores, he reported having four other children with two other women. He stated that he dropped out of high school as a freshman because his girlfriend was pregnant. He stated a goal of obtaining his GED certificate. Petitioner described working as a security officer prior to his arrest and a previous job as a forklift operator. He reported taking pain medication for his gunshot wounds. He also reported having been diagnosed with bipolar disorder and depression in 2000 and taking daily doses of three prescribed psychotropic medications. He described his drinking habits, including having consumed beer and a bottle of tequila on the day of his arrest, and his former drug addiction. He denied any former gang affiliation and reported spending his free time playing chess and reading the Bible. He specifically declined to comment on his version of the offense of which he was convicted.

Nothing in this report suggests that petitioner was confused or otherwise unable to fully participate in the interview process. The interviewer did not report observing any deficit in attention, communication, or understanding.

On January 31, 2004, a hearing was held on the defense motion for a new trial. Again, defense counsel argued that the evidence did not prove intent to kill. The motion was denied and the matter proceeded to sentencing. The court ascertained that both attorneys had read the presentence report and asked defense counsel if there

were any modifications or corrections to be made to the report. Defense counsel said there were not.

After hearing from both attorneys on sentencing, the court asked petitioner if he wanted to take the opportunity to speak on his own behalf. He read a statement that he had written:

"To the judge or to whoever it may concern, on October 8th '02, I got mad at Gloria and I left the house. She followed me, yelling at me and me at her.

I got mad because I felt that she was cheating on me. We had this problem for some time. At the time I felt very depressed. I did not know why, but I felt like this a lot. I was going through depression. I even tried to kill myself more than one time.

So when I left, I went by my mother's house and sat in my van and drank about three-and-a-half six packs. And I was feeling depressed.

When I came back home, I threw the keys on the floor at the front door and left. Gloria picked them up and I went back, knocked on the window and Gloria opened the door. We were talking. Me, Gloria, and Maria.

I opened the bottle of tequila and drank it. At some time I took a nap. I got up and me and Gloria started arguing again.

I got mad and threw a glass of tequila. Gloria ran upstairs, and I told her to go ahead and call the police because I was going to kill myself and the police.

Now, I went to the kitchen and grabbed some knives. I think I even grabbed a fork too. And I went out into the–stood in the doorway. Gloria's sister came out her door upstairs, and I told her I was going to kill myself and the police. And I waited for the police.

Now, at the moment that Gloria ran upstairs, I remembered that I had seen on the news about two to three weeks ago that a man was shot and killed by police because he had a big knife, a machete. He was waiving it like a crazy man and the police killed him.

So I thought by me grabbing the knife, that the police will kill me.

At around that–okay. Grabbing a small knife, I believe waiving it around the police would kill me.

Now, I could have stabbed the police at any time, but I did not. The police shot me in my leg, so I knew that they were not going to kill me.

I tried to walk to my van that was on the corner at the time. I was walking on the fence with my right hand on the fence and I did not have the knife. The police shot me in my back. When I fell on the floor and grabbed my side, I still wanted to die. So when the paramedics came, I pushed them away and when I was in the hospital, I still wanted to die. I told the doctor to leave me alone. I was not going to sign anything.

I did not want to kill anyone, and I did not plan to kill anyone. And I did not plan to kill the police.

If I would have planned to kill anyone, I would have grabbed my rifle that I had at the time. But I did not because I did not plan to do anything that day. I just got mad and I wanted to die.

Now, I did not do anything to hurt Gloria for her to call the police and threw a glass. When she ran upstairs, I knew that she was going to call the police. So I told her to go ahead and I threw some furniture.

I was upset. I wanted to die that night or should I say that morning. I was not thinking of the consequences. I just wanted to die.

Now, since I came to Cook County jail, ten months ago, I had two choices, one to join a gang or to open a bible. I opened the bible. And I am–I made a friend Martin. He's a born again Christian, and he helped me a lot to get through this time in jail.

Now I am a born again Christian, and I know I have a reason to live. That is for my kids, all of them, and my stepdaughter.

There are so many things I need to teach them, so they do not do the same mistakes I have. And this is the first time I have been in jail longer than a week and the experience was good for me.

I am not drinking any more. I do not want to kill myself. I want to live.

I take the medicine I need which I stopped taking in the world.

I know that I need this medicine, so I do not feel depressed. I have to deal with my problems and stop trying to kill myself.

Now, I still have all the problems in the world. And I–and a thousand more. But I have to deal with them, and I know that I will not try to kill myself or act crazy with anyone or the police in here or outside because I am taking my medication. I know that I have to deal with my problems. And when I feel bad or down, I open my bible to help me with my problems in my life.

I am not the same person that I was before. Now since I went to trial, some people have told me because I take medication, psych medication that I was supposed to have a psych evaluation and that I could not have gone to trial. I do not know if this is true. I will find out. But I know that I am not happy with the decision that happened on the last court date.

I think my lawyer should have brought up all these things about me.

Now I made a statement at the police–at the hospital to a woman who told–I told her that I had–that I–that I–I told her that I had a small knife that I pulled out of my pocket, and I wouldn't put it down. The police shot me in my leg and in my back.

And I got up and they shot me again. I did not have the knife.

Now my lawyer did not bring up all these things of what happened to the statement. All my lawyer did was promise that I will go home.

Now my mother tells me that I'm looking at one to 20 for something I did not do. Instead of taking the three years that state's attorney offered me that I wanted to, but my lawyer told me that I was going home. There should be something I could do about these things.

I can–I do not want to hurt anyone. I just wanted–went about things the wrong way because I wanted to die that day.

Even on my last court date, I felt like I wanted to die. I know I have to deal with this problem. I am sorry for my mistake. I have been here ten months. I do not know how much longer or if or when I get out. I know I need to do three things.

One, I need my medication. And I have to take it every day to get better, so I do not–so I could get better and get through the day.

Two, get in some kind of inpatient or outpatient program and never drink any kind of alcohol.

Three, find good church.

If you need to find out more, you can ask my mother, and Gloria, the paramedics, the doctor, the woman that took my statements, they know that these things I say are true.

Now everything I say in this letter is what I feel and know is the truth. And I feel if you ask the police or Gloria if I could have stabbed the police at any time, they will say yes. But I did not stab or injure the police because I did not want to hurt anyone.

I just wanted to–wanted the police to kill me. And if you ask the police or Gloria if this is more than just an assault on police because I pushed the officer's gun, I will guess–I guess–just scared them and they will say, yes.

Now, I got what I asked for because I wanted them to kill me and shoot me and kill me.

Your honor, these are–I've been taking psych medication since I came in here. These are proof and I was taking psych medication before I came. This is from the world [referring to documents]."

-32-

At this point, the trial court interrupted petitioner to ask if he had anything to say in mitigation before sentencing. Defense counsel informed the court that petitioner was mistaken about the existence of a plea offer. The court then remarked that it was "more interested in something else that now crops up for the first time"–the fact that petitioner had been taking psychotropic medication.

Defense counsel stated that he had not been aware that his client was taking medication. The court asked: "You had no reason to have any *bona fide* doubt as to the defendant's fitness to stand trial?" Counsel responded that the petitioner "spoke very coherently to me, seemed fine," and that he "had no problem communicating with him." The trial court also questioned the prosecutor, who stated that he had "no knowledge of it."

The court then concluded:

> "Nothing the court has observed in the conduct and appearance of Mr. Brown over the months would indicate to me that I would have any *bona fide* doubt as to his fitness.
>
> So the fact that he was receiving psychotropic drugs, I believe is of no consequence standing alone and of itself, and the court will treat it as such."

Viewing the record as a whole, there was no indication during trial that the petitioner lacked understanding of the proceedings or was unable to communicate with counsel or assist in his defense. Yet, the majority dismisses petitioner's waiver of his right to a jury trial and his right to testify as "essentially brief exchanges with the trial court" that "do not positively rebut" the allegations in his postconviction petition and that "do not conclusively demonstrate an ability to understand the proceedings or assist in the defense." Slip op. at 11.

This court has never required that the record "positively rebut" a postconviction claim that a *bona fide* doubt existed of fitness or that the record "conclusively demonstrate" fitness. The requirement is that the petitioner allege facts which, if known to the trial court at the time of trial, along with all other facts that the record demonstrates were known to the trial court at that time, would have created a *bona fide* doubt. Petitioner has alleged no facts that create an arguable question

of fact on this point. He has made a bare assertion that he did not understand the proceedings.

The majority does not mention the presentence report, which describes an individual who is fully capable of communicating and of understanding his situation. Indeed, he chose to reveal facts about his education, his family, his work history, and his past drug and alcohol use, but declined to discuss the crime itself. The record is clear that the court was aware of the contents of the report, including petitioner's history of mental illness, at the onset of the sentencing hearing, before petitioner raised the question of a fitness hearing.

I have quoted petitioner's lengthy statement at his sentencing hearing in its entirety because it clearly reveals a competent individual, arguing to the court that he lacked the mental state necessary to sustain a conviction of attempted murder. He focused on his previous depression and desire to end his own life. The court, however, had already considered and rejected this defense, finding that petitioner's repeated statements that he intended to kill police officers who responded to the domestic violence call were sufficient evidence of his state of mind and were not negated by his own willingness to die in the attempt.

His statement regarding what he had been told by others suggests that he believed, incorrectly, that the mere fact of his taking medication might have enabled him to avoid trial. He did not claim to have been confused during any of the pretrial proceedings or during his bench trial. He did not say that he had not understood his right to a jury trial or his right to choose whether to testify. He did not claim that he had difficulty understanding what counsel told him or communicating with counsel. In fact, he repeatedly stated that the medication had improved his mental state and that he needed to continue taking it.

The majority finds his detailed statement to be of

> "limited significance because it was made more than one month after the trial. Thus any indication that petitioner was lucid in making the statement or understood the trial proceedings at that time does not necessarily establish his condition at the time of trial. In particular, the statement does not contradict petitioner's allegation that his psychotropic

medication prevented him from understanding the trial proceedings."

I disagree. The fact that he wrote and delivered this statement stands in stark contrast to his new allegation of confusion, lack of understanding, and inability to talk or question. The record reveals a defendant who was fully capable of understanding the proceedings and assisting in his own defense, and whose own attorney observed no signs of unfitness. The trial court, on the record, stated that his conduct and appearance did not raise a *bona fide* doubt of his fitness.

A review of the record reveals that none of the *Eddmonds* factors were present at the time of trial. His demeanor at trial was unremarkable. He did not engage in irrational behavior. There are no prior medical opinions regarding his competence. Defense counsel, on the record, stated that his client was cooperative and communicative. The petition and accompanying documents do not allege any new facts regarding these factors.

In similar circumstances, our appellate court has affirmed the summary dismissal of claims of postconviction claims of ineffective assistance of counsel on the basis that the claims were belied by the record.

In *Swamynathan*, the petitioner's claims were not only conclusory, as noted above, they were "plainly refuted by the record, which reflect[ed] that no *bona fide* doubt regarding defendant's fitness existed at the time he entered his guilty plea." *Swamynathan*, 385 Ill. 2d at 441.

Similarly, in *People v. Williams*, 364 Ill. App. 3d 1017 (2006), the petitioner claimed that he had been unfit to plead guilty because he suffered from several forms of mental illness and had an extremely low IQ. He stated in his accompanying affidavit that he had been taking psychotropic medications during his incarceration and that at the time he pleaded guilty he was not thinking rationally. *Williams*, 364 Ill. App. 3d at 1020. He argued that summary dismissal of his petition was error because it raised a *bona fide* doubt of his fitness to plead guilty. *Williams*, 364 Ill. App. 3d at 1023. Taking the factual allegations as true, the appellate court rejected the claim because the record of the guilty plea proceeding clearly showed that he

understood the nature and purpose of the proceedings. *Williams* 364 Ill. App. 3d at 1025.

In the present case, taking the factual allegations in the petition as true, the record nevertheless belies his claim of a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and assist in his defense. Slip op. at 12.

*Application of Established Precedent*

In *Johnson*, a capital case, the trial court dismissed the postconviction petition without an evidentiary hearing. This court affirmed. *Johnson*, 183 Ill. 2d at 184. The petition was accompanied by a report prepared by a psychologist who evaluated Johnson after his conviction. The doctor wrote that Johnson "was intellectually incapable of understanding the admonitions of the trial court regarding his waiver of jury for sentencing." *Johnson*, 183 Ill. 2d at 192. Based on this assessment, Johnson argued that his intellectual limitations rendered him unable to " 'understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense,' " thus rendering him unfit for trial. *Johnson*, 183 Ill. 2d at 192-93, quoting *Drope v. Missouri*, 420 U.S. 162, 171, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 903 (1975). After noting that the "critical inquiry is whether the facts presented in defendant's post-conviction petition raised a *bona fide* doubt of his fitness to stand trial" (*Johnson*, 183 Ill. 2d at 193), this court concluded that Johnson failed to meet his burden of "showing that, at the time of trial, there were facts in existence which raised a substantial and legitimate doubt as to his mental capacity to cooperate with counsel and meaningfully participate in his defense." *Johnson*, 183 Ill. 2d at 193-94. Specifically, this court stated that he had offered "no evidence regarding his demeanor or that he acted irrationally at trial. In addition, there was no prior medical opinion on defendant's competence to stand trial." *Johnson*, 183 Ill. 2d at 194. Thus, none of the factors identified in *Eddmonds* as indicators of a *bona fide* doubt were present. Further, the only new evidence offered was the psychologist's opinion that Johnson was incapable of understanding the court's admonitions because of his inability to comprehend complex sentences. This court concluded that the "facts offered by

-36-

defendant fall short of raising a *bona fide* doubt of his fitness." *Johnson*, 183 Ill. 2d at 194.

In the present case, the only objective indicator of possible doubt as to petitioner's fitness is the fact that he was taking psychotropic medication at the time of trial. This fact, standing alone, is insufficient to create a *bona fide* doubt. *People v. Mitchell*, 189 Ill. 2d 312, 330 (2000). Like the defendant in *Johnson*, petitioner now claims to have been unable to understand the proceedings at trial but, like Johnson, he "offers no evidence regarding his demeanor at trial or that he acted irrationally at trial" (*Johnson*, 183 Ill. 2d at 194) and no prior medical opinion on his competence to stand trial.

In *Mitchell*, we again affirmed the dismissal of a postconviction petition without an evidentiary hearing in a capital case. At the time of his trial and sentencing, Mitchell had been taking two medications to control his epilepsy. His petition alleged that the trial court had been aware of his condition, which had existed since a head injury when he was six years old, and that he was taking psychotropic medications to control his seizures. *Mitchell*, 189 Ill. 2d at 323. The petition was accompanied by an affidavit by a pharmacology consultant, who listed the "probable side effects of the drugs as 'sedation, hallucinations, dizziness, incoordination, depression, emotional changes and behavioral deterioration, psychosis and aggression.' " The affidavit also stated that the " 'combination of the effects of both of these drugs can cloud the sensorium (alter the ability to think clearly) and thus effect [*sic*] any individual's ability to make certain decisions.' " The consultant concluded that the " 'overall sedative effect may have caused Mr. Mitchell to appear too relaxed or too detached during court proceedings.' " *Mitchell*, 189 Ill. 2d at 323.

In addition, Mitchell's petition included an affidavit from a clinical psychologist, who tested him in prison and determined that his "verbal IQ was 73, his performance IQ was 75, and his full scale IQ was 73." The psychologist also found that his "math skills were at a fourth-grade level and that his reading and spelling skills were below the third-grade level," characterizing the defendant "as having a severe language-based learning disability." The psychologist stated that the defendant's "cognitive abilities were limited and that, although defendant's IQ scores showed that he was borderline

mentally retarded, his inability to read and his slowed information-processing speed left him functioning more like someone in the mildly to mild/moderately impaired range." *Mitchell*, 189 Ill. 2d at 353-54.

This court found that the record belied any claim that he had not understood the nature of the proceedings or was unable to assist in his defense. *Mitchell*, 189 Ill. 2d at 334. Specifically, we noted:

> "Defendant's exchanges with the trial judge do not display any confusion about the nature of the proceedings, and defendant assisted in his defense by testifying in his own behalf. Defendant testified to his whereabouts at the relevant times, denied any involvement in the crime, and asserted that his confession to the police was coerced. Defendant's testimony covered over 50 pages of the report of proceedings and does not disclose any signs of confusion about the nature or purpose of the proceedings. Similarly, defendant gave extensive testimony in support of his motions to suppress statements and evidence, and there is no indication that defendant did not understand the nature or purpose of those proceedings." *Mitchell*, 189 Ill. 2d at 334-35.

We also noted that while a trial judge "cannot rely on trial demeanor to dispense with a fitness hearing in the face of evidence of a *bona fide* doubt of defendant's fitness," there was no evidence in the record suggesting a *bona fide* doubt of fitness at the time of trial. *Mitchell*, 189 Ill. 2d at 335.

Similarly, in the present case, petitioner's exchanges with the trial court do not display any confusion about the nature of the proceedings. Although petitioner elected not to testify at his bench trial, he presented a lengthy statement, which he had written himself, at his sentencing hearing. The fact that the sentencing hearing was held several months after the bench trial weighs little in light of the fact that petitioner not only continued to take the psychotropic medication at the time of his sentencing, he credited the medication with an improvement in his mood and outlook. As in *Mitchell*, the record in this case belies petitioner's claim.

In addition, in *Mitchell*, even the presence of affidavits from a pharmacologist and a clinical psychologist did not negate the trial

record, which demonstrated that the defendant "fully understood the nature of the proceeding against him, and was able to cooperate in his defense." *Mitchell*, 189 Ill. 2d at 337. Petitioner in the present case offers only affidavits from his mother and aunt, who state that prior to his arrest, petitioner was diagnosed as bipolar and that he has made several suicide attempts, and medical records documenting this diagnosis.

In *Easley*, the postconviction petitioner claimed that he had asked counsel to arrange for a physical examination and a brain scan because he believed that something was wrong with his brain and he experienced "a lot of headaches." He stated that when he got angry or upset, he would "blank out–my mind goes blank; my nerves jump and I can't think clearly." Also, when he read or spoke, "he forgot everything that he was reading or thinking." *Easley*, 192 Ill. 2d at 320. Counsel did arrange for a psychological evaluation, but Easley refused to cooperate because he believed that the psychologist had been sent by the State. *Easley*, 192 Ill. 2d at 319-20. This court concluded that this "evidence does not help defendant" because fitness "speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound." *Easley*, 192 Ill. 2d at 320.

Easley also made "several irrational statements" during his trial, including an outburst at a pretrial hearing. *Easley*, 192 Ill. 2d at 320. Based on a colloquy between Easley and the trial judge, this court concluded that he understood the nature of the proceeding. His hostile conduct was not a sign of unfitness, but was based on "his belief that the criminal justice system demeaned him." *Easley*, 192 Ill. 2d at 321-22.

Affidavits regarding postconviction psychological examinations indicated that Easley "had long-standing mental problems at the time of trial that affected his ability to understand written and oral instructions. When under extreme stress, [he] suffered from thought and personality disorder, paranoia, and episodic breaks with reality." *Easley*, 192 Ill. 2d at 322. This court noted that the "fact that a defendant suffers from mental disturbances or requires psychiatric treatment does not necessarily raise a *bona fide* doubt as to [his] ability to understand the proceedings and to assist counsel in the

defense." *Easley*, 192 Ill. 2d at 322. Then, taking his allegations as true, this court concluded that his postconviction petition did not raise a *bona fide* doubt of his fitness to stand trial and his claim of ineffective assistance of counsel, therefore, failed. *Easley*, 192 Ill. 2d at 323.

Compared to *Easley*, the quantum of evidence alleged by petitioner in support of his claim is minuscule. He offers only his self-serving statement that he did not understand what was going on at his trial, which is belied by the record, and the statements of his mother and aunt that he had a history of mental illness prior to his trial, that he was suicidal at times, and that he was being treated with psychotropic drugs. He offers no objective evidence, either in the record or by means of affidavit, of the existence of facts that, if known at the time of trial, would have raised a *bona fide* doubt of his fitness.

In *Burt*, the petitioner was evaluated by a psychologist prior to trial. The doctor found him fit and defense counsel stipulated to the contents of the report. As a result, no fitness hearing was held. Petitioner was taking psychotropic medications at that time and counsel and the court were aware of this fact. *Burt*, 205 Ill. 2d at 33. Against the advice of counsel, Burt subsequently changed his plea from not guilty to guilty. He was convicted and sentenced to death. *Burt*, 205 Ill. 2d at 33-34. In his postconviction petition, he asserted that counsel was ineffective for failing to request a fitness hearing. We affirmed the trial court's dismissal of the petition without a hearing.

His petition alleged that his decision to plead guilty was irrational and "illustrated that his 'will had become flattened' and 'his desire for self-preservation disappeared.' " *Burt*, 205 Ill. 2d at 40. We found this allegation contradicted by the record, which revealed that he willfully rejected the advice of counsel and that he responded to the trial court's admonishments by stating that he wished to plead guilty. *Burt*, 205 Ill. 2d at 40. In addition, he clearly understood the consequences of a guilty plea, because the trial court informed him of these consequences and he stated that he " 'understood fully.' "

Burt also alleged that he had difficulty concentrating during court proceedings and pointed to a defense request for a continuance because he could not participate in jury selection as a result of his

medication and difficulty sleeping. The trial judge granted the request. Later, when he attempted to withdraw his guilty plea, the court observed that he "appeared to be alert in court and participated in his defense." *Burt*, 205 Ill. 2d at 42.

Finally, Burt offered an affidavit from one of his trial attorneys, describing his "frequent mood swings," his "belligerent or explosive behavior," and his threat to become violent in the courtroom. He argued that this was evidence of a *bona fide* doubt of his fitness. Based on our review of the record, we concluded that these things did not affect his understanding of the proceedings or his ability to participate in his own defense. *Burt*, 205 Ill. 2d at 43. Thus, he failed to establish the prejudice prong of a claim of ineffective assistance of counsel. *Burt*, 205 Ill. 2d at 44.

In the present case, defendant offers only his use of psychotropic medication during trial and a bare assertion, without specific factual allegations, that he did not understand the proceedings. If the allegations in *Burt*, including the objectively verifiable fact that he required a continuance as a result of the effects of his medication, were insufficient to survive dismissal without a hearing, surely the allegations in the present case are insufficient.

In *People v. Harris*, 206 Ill. 2d 293 (2002), the postconviction petition included allegations that, at the time of trial, Harris suffered from depression, dependent personality disorder, and organic brain disorder. *Harris*, 206 Ill. 2d at 302. His petition was accompanied by a report of a postconviction psychological assessment confirming these diagnoses. *Harris*, 206 Ill. 2d at 303. Taking these allegations as true, we stated that they did not necessarily establish that he was unfit:

> "In this case, the record clearly illustrates that defendant understood the nature and purpose of the proceedings. On several occasions, the court provided defendant with a detailed explanation of the proceedings and informed defendant of his rights during those proceedings. Following these admonishments, defendant stated that he understood. Furthermore, the record shows that defendant participated in his own defense; communicated and conferred with his trial counsel; expressed to the court his understanding of the proceedings, including his decisions to litigate rather than

-41-

agree to a plea, waive his right to testify, and waive his right to a jury at the sentencing hearing; and articulated a clear statement in allocution during mitigation." *Harris*, 206 Ill. 2d at 305.

In the present case, despite his ingestion of psychotropic medication and his subsequent allegation that he did not understand the proceedings, petitioner also "expressed to the court his understanding of the proceedings," including his decisions to waive his right to a jury and his right to testify. He also "articulated a clear statement" at his sentencing hearing.

In *People v. Johnson*, 206 Ill. 2d 348 (2002), we affirmed the dismissal of postconviction petition without evidentiary hearing where the petitioner claimed both that the trial court had actual doubts as to his fitness and failed to hold a fitness hearing and that certain facts existed that would have raised a *bona fide* doubt of his fitness had the trial court been aware of them at the time it accepted his guilty plea. Facts known to the trial court included an apparent suicide attempt at the time of his arrest that made the trial court "attuned to the possibility that his mental state was less than stable." *Johnson*, 206 Ill. 2d at 365. New facts alleged in the petition included his mother's testimony at the sentencing hearing regarding his history of mental illness and the report of the clinical psychologist, who testified at the hearing on petitioner's motion to withdraw his guilty plea. Petitioner argued that the evidence developed after he pleaded guilty, when considered in combination with the information known to the trial court at the time, was sufficient to raise a *bona fide* doubt of his fitness to stand trial or to enter a knowing and intelligent guilty plea. *Johnson*, 206 Ill. 2d at 361.

We concluded that "no *bona fide* doubt as to petitioner's fitness would have existed at the time he pleaded guilty, even if the trial court had been aware of the facts now available." *Johnson*, 206 Ill. 2d at 373. We gave great weight to the fact that the trial court specifically inquired of defense counsel whether he had any concerns about his client's fitness and he replied that he did not. In addition, the trial court made a record of its own observations of the defendant in the courtroom setting and its opinion that he well understood what the proceedings were about. *Johnson*, 206 Ill. 2d at 373.

In the present case, when the trial court became aware that petitioner was taking psychotropic medication, it conducted a similar inquiry and counsel responded that he had no concerns about his client's fitness. Similarly, the trial court made a record of its own observations of petitioner in the courtroom setting, finding no indication of unfitness. See also *People v. Moore*, 189 Ill. 2d 521, 536 (2000) (affirming dismissal of postconviction petition without evidentiary hearing where defendant "exhibited rational and competent behavior at trial *** engaged in colloquies with the trial judge in which he was responsive and appropriately acknowledged certain rights"); *People v. Shum*, 207 Ill. 2d 47 (2003) (affirming dismissal of postconviction petition without evidentiary hearing; petition accompanied by neuropsychiatrist's report that petitioner experienced auditory verbal memory retrieval problems as a result of a brain injury, social worker's report that petitioner had a family history of mental illness including schizophrenia, and report of psychiatrist that petitioner insisted on controlling his own case and refused to cooperate with counsel; these facts, if known at the time of trial would not have raised *a bona fide* doubt of fitness in light of fact that petitioner filed *pro se* motions, waived certain rights, and spoke clearly in allocution at sentencing).

In sum, petitioner in the present case knowingly and voluntarily waived certain rights, speaking clearly to the court during admonishments, and spoke clearly at his sentencing hearing. He points to no objectively verifiable fact in existence at the time of his trial, other than the mere fact of his taking psychotropic medication, that might suggest he was unfit. Like the petitioners in each of these cited cases, he has not made sufficient allegations, supported by affidavit or other form of proof, to demonstrate that a *bona fide* doubt of his fitness would have existed at the time of trial if the court had been aware of the facts.

These cases can be distinguished in one important respect from the present case. That is, each of these cases is a capital case in which the petitioner likely had the assistance of counsel to prepare a postconviction petition. 725 ILCS 5/122–2.1(a) (West 2006). Petitioner in the present case filed a *pro se* postconviction petition. As such, the standard of *Hodges* applies to his claim. Nevertheless, these capital cases do summarize this court's previous approach to using

the record to assess postconviction claims of ineffective assistance of counsel for failure to obtain a fitness hearing. If the records in these cases belied postconviction claims of unfitness for trial, the record in the present case surely belies petitioner's claim.

Under the *Hodges* standard, the petitioner is not required to include legal argument or citation to authority. *People v. Edwards*, 197 Ill. 2d 239, 244-45 (2001). However, he must still plead sufficient facts to assert an arguably constitutional claim. *Hodges*, 234 Ill. 2d at 9. This means that he must plead sufficient facts to create an arguable question of fact whether a *bona fide* doubt of his fitness to stand trial existed at the time of his trial had the trial court been aware of the facts now alleged.

This court has had few occasions to address the first-stage dismissal of a *pro se* postconviction petition in a noncapital case. However, in *People v. Hanson*, 212 Ill. 2d 212 (2004), a direct appeal, we reviewed the defendant's argument that his due process rights were denied because he was not given a fitness hearing. The defendant was convicted in a bench trial of aggravated battery and resisting a peace officer. Defense counsel requested a fitness evaluation, alleging in the motion that a *bona fide* doubt existed of his client's fitness to stand trial. *Hanson*, 212 Ill. 2d at 214-15. The court ordered a psychiatric evaluation. The psychiatrist found the defendant fit and counsel withdrew the motion. *Hanson*, 212 Ill. 2d at 215. One issue on appeal was whether the trial court's granting of the motion "implicitly signaled" the court's belief that there was a *bona fide* doubt as to defendant's fitness. *Hanson*, 212 Ill. 2d at 216. We rejected the contention that the mere granting of a motion for a fitness hearing necessarily establishes a *bona fide* doubt. *Hanson*, 212 Ill. 2d at 218.

We then turned to the defendant's claim that the record supported a finding of *bona fide* doubt of his fitness to stand trial. We applied the *Eddmonds* factors to conclude that no such doubt existed:

> "After reviewing the transcript of the pretrial proceedings, we cannot say that, under the first factor, defendant's conduct supports a finding of *bona fide* doubt. Defendant's demeanor and behavior during these proceedings were interested, rational, and appropriate. While a cold record may be an imperfect means of evaluating defendant's behavior and

demeanor, we note that the trial court had the opportunity to observe defendant's conduct and demeanor firsthand during the proceedings, yet expressed absolutely no concerns about defendant's ability to understand the nature of the proceedings or to work with counsel." *Hanson*, 212 Ill. 2d at 223-24.

As to the second *Eddmonds* factor, we stated:

"[T]he motion for psychological examination filed by defense counsel asserted that '[c]ounsel feels that there exists a bona fide doubt as to whether the Defendant is able to understand the nature and purpose of the proceedings against him and assisting [*sic*] in his defense.' This court stated in *Eddmonds*, however, 'an assertion by counsel that a defendant is unfit does not, of itself, raise a *bona fide* doubt of competency.' [Citation.] We do not give great weight to this factor in this case because the motion failed to provide any facts to substantiate counsel's 'feeling' that doubt existed." *Hanson*, 212 Ill. 2d at 224.

And, as to the third *Eddmonds* factor, we stated:

"In *Eddmonds*, we recognized that the existence of a mental disturbance or the need for psychiatric care does not necessitate a finding of *bona fide* doubt since '[a] defendant may be competent to participate at trial even though his mind is otherwise unsound.' [Citation.] Here, the record shows that defendant had been diagnosed at various times with a lengthy list of problems, including organic personality and brain disorder or syndrome, alcohol dependence, dementia, seizure disorder, amnestic disorder, and bipolar disorder. Nonetheless, any connection these problems may have had to defendant's fitness at the time the motion was filed remains unexplained." *Hanson*, 212 Ill. 2d at 224-25.

The petitioner in the present case offers even less support for his claim that he should have been given a fitness hearing than did the defendant in *Hanson*. In *Hanson*, we did not give "great weight" to defense counsel's opinion that doubt existed about his client's fitness. Yet, the majority gives no weight at all to defense counsel's assertion that petitioner "spoke very coherently to me, seemed fine," and that he "had no problem communicating with him."

Based on my review of the petition and the record, I find petitioner's claim to be factually baseless because he offers no new objectively verifiable evidence that, if true, would negate the clear record of his fitness at the time of trial.

Further, if the quantum of evidence alleged in this petition is sufficient to create a *bona fide* doubt of fitness despite the record in this case, then all a postconviction petitioner must do to survive summary dismissal is to make a nonspecific allegation that he was confused at trial and did not understand what was happening. I do not believe that it was this court's intent in *Hodges* to preclude summary dismissal of a postconviction petition even when the claim raised therein is belied by the record.

Conclusion

Our case law is clear that when a postconviction petitioner makes a claim of ineffective assistance of counsel for failure to request a fitness hearing, he must allege something more than the mere fact that he was taking psychotropic medication at the time of trial to survive summary dismissal of his claim. The majority finds something more in his bare assertion that he did not understand the proceedings and in the suicidal "nature of the offense."

Our case law is also clear that a defendant's desire to commit suicide is not necessarily an indication of unfitness to stand trial. See *Johnson*, 206 Ill. 2d at 365. Neither is the existence of some form of mental illness or intellectual deficit. See *Johnson*, 183 Ill. 2d at 194; *Mitchell*, 189 Ill. 2d at 334-35; *Easley*, 192 Ill. 2d at 322; *Harris*, 206 Ill. 2d at 305.

In overlooking this body of precedent, the majority all but abandons the *Eddmonds* factors, none of which are demonstrated in the record or by facts alleged in the petition, as well as the requirement that the postconviction petition raise a "real, substantial and legitimate doubt" of fitness at the time of trial. *Eddmonds*, 143 Ill. 2d at 518.

As a result, I agree with the appellate court, which affirmed the summary dismissal of the petition, saying:

"We find defendant is unable to establish the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing had it been apprised of the evidence offered in his postconviction petition. The record shows that defendant participated in the proceedings and did not exhibit any irrational or odd behavior in court. At sentencing, defendant read a long, detailed statement in mitigation. In the absence of other evidence raising a *bona fide* doubt of defendant's fitness, we hold defendant has not stated the gist of a constitutional claim of ineffective assistance of counsel."

JUSTICES THOMAS and KARMEIER join in this dissent.